IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-00957-MSK-KLM

JAMES FREDERICKS,
BROOKE FREDERICKS,
ELISABETH FREDERICKS, and
SARAH FREDERICKS,

       Plaintiffs,

v.

TRINA KOEHN,
MIKE RIEDE,
ROCKY MOUNTAIN OFFENDERS MANAGEMENT SYSTEMS, INC.,
SAMUEL WELLINGTON,
DEBRA WELLINGTON,
RAGNAR STORAASLI, Ph D.,
MARY MARGARET JONSSON, Ph.D.., and
PARKER & FROYD MENTAL HEALTH SERVICES, P.C.,
*With All Governmental Personnel Named in Both Their Individual Capacities,*

       Defendants.

---

## ORDER ON MOTIONS

---

THIS MATTER comes before the Court on the following motions:

(1)     a motion to dismiss **(#77)** filed by Defendants Trina Koehn and Michael Riede, to which the Plaintiffs responded **(#105)** and Ms. Koehn and Mr. Riede replied **(#113)**;[1]

(2)     the Plaintiffs' motion **(#104)** for leave to file a 41-page response to the motion to dismiss;

(3)     a motion for judgment on the pleadings **(#128)** and supporting brief **(#129)** filed by

---

[1] Due to the filing of a Second Amended Complaint, Ms. Koehn's and Mr. Riede's motion to dismiss **(#34)** claims in the original complaint is denied, as moot.

Defendant Rocky Mountain Offender Management Systems, LLC, to which the Plaintiffs responded (**#154**) and this Defendant replied and submitted supplemental authority (**#156, #157**), which prompted an additional response by the Plaintiffs (**#159**); and

(4)     two motions (**#145, #153**) filed by the Plaintiffs seeking an enlargement of time to respond to the motion for judgment on the pleadings.

Having considered the same, the Court

**FINDS** and **CONCLUDES** that:

## I.  Jurisdiction

For purposes of determining the motions pending in this case, the Court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.[2]

## II.  The Second Amended Complaint

The Plaintiffs are James Fredericks, Brooke Fredericks, Elisabeth Fredericks and Sarah Fredericks (collectively, "the Fredericks").  In this lawsuit, they assert claims against probation officer Trina Koehn and her supervisor Michael Riede, a private monitoring service known as Rocky Mountain Offender Management Systems, LLC, individuals Samuel and Debra Wellington, psychologists Ragnar Storaasli and Mary Margaret Jonsson, and Dr. Jonsson's employer, Parker & Froyd Mental Health Services, P.C.

The Second Amended Complaint is far from short and plain,[3] and consists of 57 pages of allegations and 67 pages of attachments.  However, the claims themselves derive from the same core set of factual allegations.  For purposes of this ruling, the Court treats all allegations as true, and summarizes them as follows.

_____

[2] The Plaintiffs alternatively invoke the Court's jurisdiction pursuant to 28 U.S.C. § 1332.

[3] *See* Fed. R. Civ. P. 8(a).

**The Allegations**

Troy Aaron Wellington lived with his parents[4] in the house immediately behind the Fredericks.  Starting in 2000, Mr. Wellington began tormenting the Fredericks family at their home and stalking the Fredericks' teenage daughters, Elisabeth and Sarah.  He sent the two girls gifts and letters, made threats to the Fredericks family, broke into their home to vandalize and destroy items, cut off their power, left a dead rat on their property, and shined a flashlight into their windows.  Eventually, the Jefferson County Court issued a permanent restraining order which precluded Mr. Wellington from coming within 100 yards of the Fredericks' residence or the swimming pool where Elisabeth and Sarah worked.

Because of Mr. Wellington's actions, the Fredericks moved to a new home in November 2002, and attempted to conceal its location.  Mr. Wellington learned of their new address and, in violation of the restraining order, went to the new home repeatedly, where he took pictures and destroyed a satellite dish.  He was arrested in July 2003 for violating the restraining order.  He was released on bond subject to several conditions, including that he be connected to an active global positioning satellite (GPS) monitoring system.  He later pled guilty to stalking, a felony.  The court imposed a deferred sentence and a term of probation.  The conditions of his probation required that he participate in mental health counseling and treatment and that he have no contact with the Fredericks family.  The court specifically ordered that there be a "Global Positioning System or some other alternative form of electronic monitoring, to continue to assure the defendant has no contact with [the Fredericks] family." [sic].

---

[4] Troy Wellington is the son of Defendants Samuel and Debra Wellington.  For purposes of this ruling, the Court refers to Troy Wellington as Mr. Wellington.  Any references to Samuel and Debra Wellington will be either to their complete names, or to their status as Mr. Wellington's parents.

To comply with the terms of his probation, Mr. Wellington was placed on GPS monitoring through Rocky Mountain Offender Management Systems, LLC ("RMOMS").  RMOMS offered two types of GPS monitoring: active and passive.  Both types of monitoring involved use of an ankle bracelet which showed the bracelet-wearer's location, including whether the wearer entered into a prohibited "Exclusion Zone."  RMOMS could also detect removal of, or tampering with, the ankle bracelet under either type of monitoring.  Active GPS monitoring entailed continuous surveillance of the bracelet-wearer on a "real time" basis, and provided for contemporaneous reporting of all violations, such as zone violations, to the wearer's probation officer.  In contrast, passive monitoring reported the location of the bracelet-wearer only once every 24 hours, and provided for no contemporaneous reporting of violations.  Active monitoring was more expensive than passive monitoring.

Following imposition of his deferred sentence and term of probation, Mr. Wellington was placed on active GPS monitoring, subject to eight specifically defined exclusion zones: (1) 600 feet from the Fredericks' residence; (2) 600 feet from Coors; (3) 1 mile from Waterworld; (4) 600 feet from Arvada West Sr. High School; (5) 600 feet from Mesa State College; (6) 600 feet from Lakewood United Methodist Pre-School; (7) 600 feet from Fairmount Elementary School; and (8) 600 feet from St. Joan of Arc Church.[5]  Mr. Wellington's entry into one of these zones required RMOMS to immediately notify the probation officers, and to place a 911 telephone call.

RMOMS was obligated to report all violations, including zone violations, to Mr.

---

[5] These were the exclusions zones which were put in place while Mr. Wellington was on bond after being arrested for violating the restraining order.  It appears that these zones continued as part of the probationary supervision.

Wellington's probation officers.  Notification in the first instance was required to be by telephone.

Secondary notification could be by e-mail.  Probation could be terminated for any violation.

While under active GPS monitoring, Mr. Wellington committed 78 violations between

January 1 and March 28, 2004.  Mr. Wellington committed another 10 violations in April 2004,

and 68 additional violations in May 2004.   It is not clear whether these were zone violations, or

bracelet violations.  It also is not clear whether all violations were reported to Ms. Koehn or Mr.

Riede,[6] but, at a minimum, Ms. Koehn was notified of the April 2004 violations.[7]  Upon learning

of any violation, Ms. Koehn could have sought to revoke Mr. Wellington's probation, but she did

not do so.

During April and May 2004, Mr. Wellington met with two psychologists as required by

the terms of his probation.  In April, he met with Dr. Storaasli, and in May, he met with Dr.

Jonsson.  During each visit, he told the psychologist that he intended to kill the Fredericks, but

neither Dr. Storaasli and Dr. Jonsson warned the Fredericks.  On April 23, 2004,  Dr. Storaasli

advised Ms. Koehn that Mr. Wellington was "lethal" to the Fredericks.

On that same day,  Ms. Koehn, with Mr. Riede's approval, and contrary to probation

policies, removed Mr. Wellington from active GPS monitoring and placed him on passive GPS

monitoring.  This was done because Mr. Wellington's parents had failed to make payments

---

[6] RMOMS used e-mail to notify the probation department of violations, when it was required to contact the probation officers directly by telephone.  Ms. Koehn and Mr. Riede approved of this method of communicating violations.  As a consequence, the probation department was uninformed about Mr. Wellington's activities between May 21 and 25, 2004 because notifications by RMOMS were sent to the probation department's e-mail box, which was full and could receive no additional messages.

[7] The Fredericks have alleged, in the alternative, that RMOMS failed to notify the probation department of such violations.

required for active GPS monitoring.  When Ms. Koehn made this decision, she and Mr. Riede

both knew[8] that Mr. Wellington had stalked Elisabeth and Sarah, was continuing to use alcohol,

was taking medication for anxiety and depression, had been referred for anger management

therapy, had repeatedly violated the terms of his probation, had repeated GPS violations and

presented an actual and imminent danger to the Fredericks.[9]  They also both knew that passive

monitoring would not ensure that Mr. Wellington would have no contact with the Fredericks

family, and that Dr. Storaasli believed that Mr. Wellington presented a lethal threat to the

Fredericks.

On May 25, 2004, while on passive monitoring, Mr. Wellington attempted to break into

the Fredericks' house through a window.  Mr. Wellington did not succeed in entering the

Fredericks' residence, however, and was apprehended by the police.  Mr. Wellington later pled

guilty to numerous charges and was sentenced to more than 50 years in prison.  The Fredericks

have since moved from Colorado.

### The Claims

Claim 1 alleges that Ms. Koehn and Mr. Riede violated the Fredericks' right to substantive

due process under the "state-created danger" doctrine, *i.e.*, that by moving Mr. Wellington from

active to passive monitoring, Ms. Koehn and Mr. Riede created a risk that Mr. Wellington would

harm the Fredericks.  The claim is asserted against these Defendants in their individual capacities

---

[8] The Fredericks allege, in the alternative, that if Mr. Riede did not possess such knowledge, then he acted with deliberate indifference and in reckless disregard of his duties.

[9] The Fredericks allege, in the alternative, that RMOMS suggested the switch to passive monitoring, and in doing so, failed to advise Ms. Koehn and Mr. Riede of the risks of using passive monitoring as opposed to active monitoring.  They also allege, in the alternative, that Ms. Koehn did not receive adequate training to recognize the dangers to the Fredericks.

pursuant to 42 U.S.C. § 1983.

Claims 2 and 3 are asserted against Mr. Riede, in his individual capacity, for his alleged failure to train and supervise Ms. Koehn, and failure to implement proper policies and procedures. These claims are asserted pursuant to 42 U.S.C. § 1983.

Claim 4 alleges willful and wanton conduct by Ms. Koehn and Mr. Riede, and is asserted against them in their individual capacities. It purports to be a tort claim based on state law.

Claim 5 alleges negligence by RMOMS, due to a failure to train the probation officers, a failure to timely and correctly report violations, and its suggestion that passive monitoring be used without disclosing the risks to the probation officers.

Claim 6 alleges that RMOMS engaged in concerted action with Ms. Koehn and Mr. Riede to violate the Fredericks' right to due process. This claim is asserted only against RMOMS pursuant to 42 U.S.C. § 1983.[10]

On all claims, the Fredericks seek to recover monetary relief for emotional injuries and expenses incurred.

## III. Issue Presented

---

[10] Claims 7 through 10 are asserted against the remaining Defendants and are not subject to a motion to dismiss. Claim 7 alleges that Dr. Storaasli negligently failed to warn or protect the Fredericks during April 2004, that Mr. Wellington was a danger to them. Claim 8 is essentially the same, but is asserted against Dr. Jonsson and her employer and is premised upon a failure to warn during May 2004. As to Dr. Jonsson's employer, the Fredericks assert vicarious liability. In each of these claims, the Fredericks allege that there was a violation of § 13-21-117, C.R.S. Claim 9 alleges that Dr. Jonsson and her employer were state actors who engaged in concerted conduct to deny the Fredericks' constitutional rights.

Claim 10 is asserted against Mr. Wellington's parents, Samuel and Debra Wellington. The Fredericks claim that the Wellingtons were negligent and breached fiduciary duties owed to the Fredericks by failing to report their son's probation violations and failing to pay for active GPS monitoring.

The issue presented is very narrow - whether the Fredericks have pled sufficient facts to to state legally sufficient claims for relief.

Before beginning its analysis, it is important to note what the Court is not determining at this juncture. First, the Court does not decide the truth of Fredericks' allegations. For purposes of this ruling, the Court assumes that everything that the Fredericks alleged occurred just as they have described it in their Second Amended Complaint. Second, although the Court accepts that the Fredericks were injured as they have alleged, at this juncture, it does not decide whether they are entitled to any recompense.

## IV. Analysis

### A. Motion to Dismiss

Ms. Koehn and Mr. Riede move to dismiss Claims 1 through 4 for failure to state sufficient facts in support of these claims. Fed. R. Civ. P. 12(b)(6).[11] The Fredericks seek leave to file a 41-page response to this 13-page motion. Because no party opposes this request, it is granted.[12]

Pursuant to Fed. R. Civ. P. 12(b)(6), a party may move to dismiss a claim for relief on the basis that it fails to state any claims upon which relief may be granted. There is a strong presumption against the dismissal of claims under this rule. *See Cottrell, Ltd. v. Biotrol Intern., Inc.,* 191 F.3d 1248, 1251 (10th Cir. 1999). The Court accepts all well-pleaded allegations in a

---

[11] Their motion is purportedly asserted under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), but they raise no jurisdictional arguments. Thus, the motion falls only within Rule 12(b)(6).

[12] However, having read the response brief, the Court notes that it is redundant and fails to comply with the format prescribed by MSK Civ. Practice Standard V.H.2. The Court anticipates that the parties will henceforth comply with the page limitations and other requirements set forth in the Civil Practice Standards.

complaint as true and construes them in the light most favorable to the plaintiff. *See Williams v. Meese,* 926 F.2d 994, 997 (10th Cir. 1991). A plaintiff is not required to include detailed factual allegations in a complaint, but a complaint must contain "more than labels and conclusions" and must consist of more than "a formulaic recitation of the cause of action[.]" *See Bell Atlantic Corp. v. Twombly*, _ U.S. _, 127 S. Ct. 1955, 1964-65 (2007). Rather, it must contain factual allegations which are "enough to raise a right to relief above the speculative level[.]" *Id.*

### The State-Created Danger Doctrine

Ordinarily, state actors are not liable for the violent actions[13] of third parties.[14] *See Moore v. Guthrie*, 438 F.3d 1036, 1042 (10th Cir. 2006). One narrow exception to this general rule is the "state-created danger" doctrine which gives rise to a substantive due process claim. *Id.* at 1042. The state-created danger doctrine was first hinted at in *DeShaney v. Winnebago Cty. Soc. Services Dept.*, 489 U.S. 189, 201 (1989). There, the Supreme Court rejected a substantive due process claim by a minor that had been removed from an abusive parent by a county social services department, only to be later returned to and suffer further abuse at the hands of the parent. The Court found that, generally, the state had no duty to protect an individual who was

---

[13] None of the parties have addressed whether a violent act occurred. They assume that Mr. Wellington's attempted break-in amounted to a violent act to which the danger creation doctrine applies. For purposes of this ruling, the Court does so as well.

[14] This general rule is demonstrated by *Martinez v. California*, 444 U.S. 277 (1980), in which the survivors of a murdered 15-year old girl sued state officials for their parole-release decision. Although the defendants knew, or should have known, that the parolee was likely to commit a violent crime, the Supreme Court concluded that the survivors could not maintain a claim for denial of due process, because it was the parolee who committed the violent act, and the parole board was not aware that the parolee presented a special danger to the decedent. However, the Supreme Court also stated: "We need not and do not decide that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole." *Id.* at 285.

not presently in state custody from harm by a third party.[15]  *Id.* at 199-201.  However, the Court

seemed to suggest that, if the state's actions created a danger that an individual was not

previously subject to, or rendered the individual more vulnerable to an existing danger, a claim

might lie.  *Id.* at 201.  In the wake of *DeShaney*, the federal courts began to recognize substantive

due process claims in situations where the state's actions had the effect of creating or magnifying

the dangers faced by plaintiff victims.  *Armjio v. Wagon Mound Public* Schools, 159 F.3d 1253,

1261-65 (10th Cir. 1998)[16]; *see also Bright v. Westmoreland County,* 443 F.3d 276, 279-281 (3d

Cir. 2006); *Greer v. Shoop*, 141 F.3d 824, 827-28 (8th Cir. 1998).

    To state a claim under the "state-created danger" doctrine, a plaintiff must allege facts

showing that: (1) a state actor created or increased the plaintiff's vulnerability to a danger in some

way; (2) the plaintiff was a member of a limited and specifically definable group; (3) the state

actor's conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm; (4)

the risk was obvious or known; (5) the state actor acted recklessly in conscious disregard of that

risk; and (6) the conduct, when viewed in total, shocks the conscience of the Court.  *See Ruiz v.

McDonnell*, 299 F.3d 1173, 1182-84 (10th Cir. 2002).

    As to the first element, the Fredericks must show an <u>affirmative</u> act by Ms. Koehn and Mr.

---

[15] The state's liability for harm caused to one held in the state's protective custody has become known as the "special relationship" doctrine.  *DeShaney*, 489 U.S. at 199; *Armjio v. Wagon Mound Public Schools*, 159 F.3d 1253, 1261 (10th Cir. 1998).  The Fredericks initially asserted a "special relationship" claim in their First Amended Complaint, but apparently abandoned that claim in the Second Amended Complaint, and proceed only on the state-created danger doctrine here.

[16] Technically, the Tenth Circuit was recognizing claims premised on the state-created danger doctrine prior to *DeShaney*.  *See Armjio*, 159 F.3d at 1262, *citing Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995).  However, after *DeShaney*, it modified its analysis to recognize only those claims that arose from the state's creation or elevation of the danger faced by the plaintiff.

Riede that created or increased the risk of danger. *Bright*, 443 F.3d at 282. It is the misuse of state authority, not the failure to use it, that potentially violates the Due Process Clause. *Id.*

As to the second element, the state actor's conduct must impose an immediate threat of harm to particular people, as compared to a general threat of harm to the public at large. *See Ruiz*, 299 F.3d at 1183.

The recklessness aspect of element 5 requires a "wanton or obdurate disregard or complete indifference" to a known risk. *See DeAnzona v. City and County of Denver*, 222 F.3d 1229, 1235 (10th Cir. 2000). This requires that the state actor either intended to cause harm, or intended to expose a particular person to an unreasonable risk of harm. *See Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003). A state actor "intends to expose a particular person to an unreasonable risk of harm" when he or she is aware of a known or obvious risk that is so great that it is highly probable that serious harm will follow, and he or she proceeds in conscious and unreasonable disregard of the anticipated harm. *Uhlrig v. Harder,* 64 F.3d 567, 574 (10th Cir. 1995) (citation and quotation omitted).

To determine whether conduct shocks the conscience as required by the sixth element, the Court considers: "(1) the need for restraint in defining the scope of substantive due process claims; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting public safety." *See Ruiz*, 299 F.3d at 1184. Ordinary negligence or knowledge that an unreasonable risk exists do not usually rise to the level of "conscience-shocking." *See id.* Rather, a plaintiff must allege actions that were in willful disregard of, or demonstrating deliberate indifference to a particular person's safety. *See e.g. Walter v. Pike County,* 465 F.Supp.2d 409, 419 (M.D. Pa. 2006).

Although Ms. Koehn and Mr. Riede concede that second element of the state-created danger doctrine is satisfied, they contend that there are insufficient facts pled to satisfy the other elements. In particular they argue that there are insufficient facts to demonstrate that: (1) they created the danger or took affirmative steps which increased the Fredericks' vulnerability to danger; (2) they engaged in conduct which put the Fredericks at substantial risk of serious, immediate and proximate harm; (3) switching to passive monitoring presented an obvious risk; (4) they acted recklessly and in conscious disregard of any such risk; and (5) their conduct was conscience-shocking. The Fredericks respond that they have alleged sufficient facts to support each element of their danger creation claim.

Construing the allegations of the Second Amended Complaint most favorably to the Fredericks, the Court concludes that there are sufficient facts alleged for all elements of the state-created danger claim. As to the first element – whether Ms. Koehn and Mr. Riede engaged in an affirmative act that increased the danger to the Fredericks – the Fredericks allege that Ms. Koehn and Mr. Riede converted the active monitoring of Mr. Wellington to passive monitoring, effectively diminishing the degree to which Mr. Wellington's whereabouts were supervised. This shift from active to passive monitoring increased the risk of serious and immediate proximate harm to the Fredericks, by creating the opportunity for Mr. Wellington to have contact with the Fredericks without the possibility of immediate intervention.

In this respect, the downgrading of Mr. Wellington's monitoring constitutes an affirmative act that distinguishes this case from the factually-similar situation in *Bright*. There, the state had convicted an individual of engaging in an crime against a 12-year old victim, and sentenced him to probation, with a condition being that he have no further contact with the victim. 445 F.3d at

278.  Like this case, the individual in *Bright* notoriously violated the terms of his probation, having been seen  by a probation officer in the company of the victim.  *Id.*  The probation officer commenced proceedings to seek revocation of the individual's probation for this violation, but sluggish efforts on the part of the probation office and prosecutors caused a delay of nearly two months before a revocation request was actually filed.  *Id* at 279.  In the intervening time, the individual murdered the sister of his victim in retaliation for attempts by the victim's family to prevent him from seeing the victim.  *Id.*  The Third Circuit rejected a claim premised on the state-created danger doctrine, however, because it found that it was the state's <u>inaction</u> (or, more accurately, delay) in invoking the probation revocation process, rather than an <u>affirmative</u> act, that gave rise to the injury.  *Id.* at 283-84.  As the Third Circuit explained, the state's "failing to more expeditiously seek someone's detention, by expressing an intention to seek such detention without doing so, or by taking note of a probation violation without taking steps to promptly secure the revocation of the probationer's probation" did not create a new danger or exacerbate a danger that otherwise already existed.  *Id.* at 284.  Citing *DeShaney*, the court explained that "the Brights were at no greater risk immediately following [the discovery of the individual's violations of the terms of probation] they were when it commenced."  *Id.* at 285.

Unlike in *Bright*, Ms. Koehn and Mr. Riede both failed to act to revoke Mr. Wellington's probation <u>and</u> affirmatively acted, by reducing the intensity of his supervision by downgrading his monitoring from active to passive.  Arguably, this decision elevated the danger that Mr. Wellington posed to the Fredericks.  Under passive monitoring, the probation office no longer had the real-time ability to assess Mr. Wellington's ventures into the Exclusion Zones, as compared to active monitoring, which allowed the probation office to immediately learn if Mr. Wellington had

13

traveled into a prohibited area and to take immediate precautionary measures if needed. This affirmative decision by Ms. Koehn and Mr. Riede to reduce the degree to which the probation office monitored Mr. Wellington's activities increased the risk that the Fredericks could be harmed by Mr. Wellington before the need for intervention was discerned. The allegation of this affirmative act is sufficient to satisfy the first element of the claim.

The second element of the claim is not at issue. Therefore, the Court turns to the third element, namely, whether the affirmative acts of Ms. Koehn and Mr. Riede put the Fredericks at risk of serious, immediate, and proximate harm. Given the fact that Ms. Koehn and Mr. Riede were aware of Mr. Wellington's history of stalking, his repeated violations of probation while on active monitoring, and his expressed intentions to harm the Fredericks, the Fredericks have clearly alleged facts sufficient to satisfy this element. By decreasing their ability to monitor Mr. Wellington in real-time – and, correspondingly, decreasing their ability to summon help in time should Mr. Wellington seek to carry out his intentions to harm the Fredericks – Ms. Koehn and Mr. Riede placed the Fredericks at an increased risk of serious and proximate harm.

These allegations are also sufficient to satisfy the fourth and fifth elements of the claim, that is, that the risks of harm were known to and consciously disregarded by Ms. Koehn and Mr. Riede. Their deliberate indifference to the potential risk of harm to the Fredericks is demonstrated by the fact that their decision to downgrade Mr. Wellington's monitoring was made the very same day that they had been advised by Dr. Storaasli that Mr. Wellington would be "lethal" to the Fredericks.

The final element of the claim requires facts that demonstrate that the conduct, as a whole, "shocks the conscience" of the Court. As stated above, the Fredericks have alleged facts that

show that Ms. Koehn and Mr. Riede's decision to downgrade Mr. Wellington's monitoring was made with full knowledge that Mr. Wellington posed a potentially "lethal" threat to the Fredericks, that he had repeatedly violated the terms of his probation while on the more restrictive active monitoring, and that such violations could have been (and arguably, <u>should</u> have been) punished by promptly seeking revocation of Mr. Wellington's probation, rather than being indirectly enabled by reduced supervision. One need not have the gift of prognostication to predict that, in such circumstances, Mr. Wellington was highly likely to continue his pattern of violating his probation by entering forbidden territory and that, without the probation office having the real-time ability to detect and respond to such violations, there was a much greater risk that his actions might indeed prove lethal to the Fredericks before any intervention could be summoned. The only purported justification for Ms. Koehn and Mr. Riede's actions is a financial one, without apparent consideration of the alternatives or supplemental protections that could have been implemented, such as notifying the Fredericks of the decision to reduce Mr. Wellington's monitoring. Ms. Koehn and Mr. Riede's actions demonstrate willful disregard and deliberate indifference to the risks to which they exposed the Fredericks. The Court has no doubt that these allegations would be shocking to the conscience of any reasonable citizen, and thus, finds that the Fredericks have adequately stated a claim for relief under the state-created danger doctrine.

### Supervisor Liability and Failure to Train Claims[17]

The Fredericks seek to hold Mr. Riede liable for the danger created by Ms. Koehn, as

---

[17] These claims against Mr. Riede appear to be pled in the alternative to Claim 1.

alleged in Claim 1, on theories of supervisory liability and failure to train.[18]  Mr. Riede asserts that

such claims cannot proceed because the Fredericks have failed to state a predicate claim under a

state-created danger theory.  *See Webber v. Mefford,* 43 F.3d 1340, 1344-45 (10th Cir. 1994);

*see also Trigalet v. City of Tulsa, Oklahoma,* 239 F.3d 1150, 1154-55 (10th Cir. 2001).  He

offers no other arguments as to why the claims are not sufficiently pled.  Because the Court has

concluded that the Fredericks have pled sufficient facts to support Claim 1, the Court cannot

dismiss Claims 2 or 3 for the reasons espoused by Mr. Riede.

**Qualified Immunity**

Ms. Koehn and Mr. Riede argue that they are entitled to qualified immunity on the § 1983

claims because the Fredericks have not alleged facts to support a *prima facie* constitutional

violation, or that the constitutional right was clearly established.  The Fredericks contend that they

have alleged sufficient facts to support their § 1983 claims, and that the law was clearly

established.  They also contend that neither Ms. Koehn nor Mr. Riede is entitled to qualified

immunity, because they had a nondiscretionary obligation to maintain Mr. Wellington's active

GPS monitoring.

When facing a claim for civil damages under 42 U.S.C. § 1983, a state actor who

performs a discretionary[19] government function is entitled to qualified immunity if his or her

---

[18] To the extent this claim is premised upon alleged violations of state law, it presents no cognizable claim under 42 U.S.C. § 1983, which only offers redress for violations of federal law done under color of state law.  *See Jones v. City and County of Denver, Colo.,* 854 F.2d 1206, 1209 (10th Cir. 1988).

[19] The Fredericks contend that Ms. Koehn and Mr. Riede are not entitled to qualified immunity because they had a nondiscretionary obligation to maintain Mr. Wellington's active GPS monitoring.  It was nondiscretionary, they contend, because active GPS monitoring was the only type of monitoring which could satisfy the sentencing court's order, and was the only type of monitoring which probation policies

16

conduct did not violate a clearly established statutory or constitutional right of which a reasonable person in his or her position would have known. *See Wilson v. Layne,* 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1247 (10th Cir. 2003). Qualified immunity is a protection from trial and other burdens of litigation. *See Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985); *see also Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005). The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *See Roska*, 328 F.3d at 1251 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). No matter how tragic the consequences of a probation officer's conduct, qualified immunity must be recognized if a reasonable probation officer could disagree as to the appropriateness of the course of action taken. *See id.*

Determination of whether a state actor is entitled to qualified immunity in the context of a motion under Fed. R. Civ. P. 12(b)(6) involves a 2-pronged inquiry. The Court first determines whether a constitutional violation was pled. This inquiry requires the Court to evaluate all allegations in the light most favorable to the Fredericks. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Then the Court determines whether the Fredericks have demonstrated that the constitutional right was clearly established at the time of the allegedly unlawful conduct. *See id.;* *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004). This latter inquiry is made in light of

---

permitted. However, they disregard the breadth of the sentencing court's order – it directed GPS "or some other alternative form of electronic monitoring" which would ensure that Mr. Wellington had no contact with the Fredericks. It did not mandate active GPS monitoring, and instead left the selection of an appropriate form of monitoring to the probation officers. Thus, the type of monitoring was left to their discretion, even if constrained by the sentencing court's order and probation policies. In addition, the Fredericks have repeatedly alleged that the probation officers could have elected to revoke Mr. Wellington's probation. In short, the entirety of their state-created danger claim rests upon the assertion that Ms. Koehn and Mr. Riede improperly exercised their discretion.

the specific context of the case, not as a broad general proposition. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*). However, the particular officer's subjective understanding of the law is not pertinent to this analysis. Whether the law was clearly established is essentially a legal question and is measured by an objective standard. *See Crawford-El v. Britton,* 523 U.S. 574, 589-90 (1998).

Although the Fredericks are not required to identify a factually identical case to demonstrate that the constitutional right was clearly established, they must identify a Supreme Court or Tenth Circuit opinion on point or demonstrate that the right is supported by the weight of sufficiently analogous authority from other courts. *See Martinez v. Carr,* 479 F.3d 1292, 1295 (10th Cir. 2007); *see also Mecham v. Frazier,* _ F.3d _, 2007 WL 2608624 *4 (10th Cir. Sep. 11, 2007). In other words, there must be caselaw in which a constitutional violation was found based upon similar conduct. *See Callahan v. Millard County,* 494 F.3d 891, 903 (10th Cir. 2007).

As to the question of what is sufficiently similar conduct, the Court turns to *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). In *Brosseau*, the Supreme Court examined whether the law governing the excessive use of force was "clearly established" in the particularized circumstances of "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." 543 U.S. at 200. There, the Court required a fairly high degree of factual similarity; it did not simply examine general law governing excessive force, or precedent involving the use of force against individuals fleeing police encounters. Similarly, in *Novitsky v. City of Aurora*, 491 F.3d 1244, 1255-56 (10th Cir. 2007), the Tenth Circuit interpreted *Brosseau* to require that, in another excessive force case, the plaintiff cite to authority that showed that "in June 2001[,] using a twist lock to remove a

potentially intoxicated individual from a vehicle for officer safety purposes was unreasonable under the Fourth Amendment." These cases make clear that, to defeat a claim of qualified immunity, the Fredericks must point to caselaw that finds a constitutional violation based on sufficiently similar factual components to this case, such that it would give the state actors here fair notice that their actions would be unconstitutional under the same analysis. *Id.* Thus, the Court's first task is to determine what the critical factual components of this case are.

To do so, the Court considers the essential elements of the state-created danger doctrine, and the factual allegations that the Fredericks have made in support of those elements. As discussed above, the claim essentially requires a showing of: (i) a state actor's (ii) reckless commission (iii) of an affirmative act (iv) that creates or exacerbates the danger faced by (v) an identifiable individual (vi) in conscience-shocking circumstances. In the particular factual circumstances here, the key components are (i) a decision to consciously downgrade the effectiveness (ii) of monitoring designed to ensure an individual's compliance with the terms of court-ordered release, where that decision is (iii) known by the state actor (iv) to pose a risk of harm to a particular victim (v) as shown by the monitored individual's prior violations of the terms of release. These particular facts are those that the Court relied upon above to find that the Fredericks have stated a constitutional claim; without them, no claim would be cognizable. Thus, the Court finds that the Fredericks must come forward with caselaw that finds that conduct involving these particular facts is actionable under the state-created danger doctrine. Analysis of the existing caselaw in light of these particular facts ensures that state actors are subject to liability only where the existing law gives them adequate notice that their conduct in these circumstances would be unconstitutional. *Novitsky*, 491 F.3d at 1256.

19

The Fredericks' response to Ms. Koehn and Mr. Riede's motion cites a wealth of caselaw, all of which the Court has reviewed.[20]   However, the Court finds that none of it corresponds sufficiently closely to the key facts herein to conclude that the unconstitutionality of Ms. Koehn and Mr. Riede's conduct was clearly established as of 2004.   Taking the cases *seriatim*:

• *Yvonne L. v. New Mexico Dept. of Human Serv's.*, 959 F.2d 883, 891 (10th Cir. 1992) and *KH. v. Morgan*, 914 F.2d 846, 850 (7th Cir. 1990) are cited solely to demonstrate the general nature of the "clearly established" requirement.

• *Armijo*, *supra*; *Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226, 1241 (10th Cir. 1999) are cited for the general proposition that the Tenth Circuit has long recognized the state-created danger doctrine.   *Johnson v. Martin*, 195 F.3d 1208, 1216 (10th Cir. 1999) is cited for the proposition that a showing of "clearly established" rights does not require "the exact factual situation at hand."   Although the Court agrees that the state-created danger doctrine has a long history in this circuit, decisions such as *Brosseau* and *Novitsky* make clear that general recognition of a type of claim is insufficient, and that a party seeking to overcome qualified immunity must show cases clearly recognizing the constitutional deprivation in a "particularized" factual context.

• The Fredericks rely generally on all of the cases cited in Section III(C)[21] of their brief. That 11-page section cites numerous cases generally applying the "special relationship" and/or "state-created danger" doctrines in various contexts.   The Fredericks' reference to this section as part of their discussion of qualified immunity does not specifically direct the Court to the particular cases cited in that section that purportedly clearly establish a constitutional right in the particularized circumstances here, and the Court declines to attempt to find such cases in this section unaided.

• In *Petrone v. Pike County Probation Dept.*, 240 F.Supp.2d 317, 320 (M.D. Pa. 2002), the court denied a motion to dismiss a state-created danger claim by a victim who claimed that state officials failed to advise her that her husband, recently released from prison, had dangerous

---

[20] The Court constrains its discussion analysis on the "clearly established" issue to those cases cited by the Fredericks on pages 31-34 of its brief, which appears to be that portion of the brief that specifically addresses this issue.   However, the Court has reviewed all of the cases cited in entirety of the Fredericks' brief, and finds nothing elsewhere that would materially alter the analysis herein.

[21] There is no Section III(C) of the brief.   The Court assumes the Fredericks are referring to Section IV(C).

propensities towards the objects of his romantic interest.[22]  Beyond having almost no meaningful analysis, *Petrone* does not involve the failure of the defendants to carry out court-ordered monitoring of the perpetrator, nor involve the conscious decision to diminish such monitoring in the face of repeated violations of the terms of release.

• In *Cornelius v. Town of Highland Lake*, 880 F.2d 348 (11th Cir. 1989), the court denied summary judgment on a state-created danger claim where the state had improperly assigned and failed to adequately supervise inmates on a work detail.  As a result, some inmates escaped from the work detail, taking the plaintiff-victim hostage for several days.  The court found several affirmative acts giving rise to liability: bringing the inmates from the prison to the building where the work detail was to take place, improperly classifying inmates with disciplinary problems and violent pasts as eligible for assignment to the work detail, and failing to properly supervise the work detail.  *Id.* at 357.  Although an analogy might be drawn between, on the one hand, Mr. Wellington's supervision being reduced from active to passive monitoring despite his repeated probation violations, and, on the other hand, the decision to step inmates with disciplinary violations down from the close supervision offered by prison incarceration to the less-effective supervision offered on work detail, the Court finds that any such analogy would be far too strained to suggest that a state actor should be required to recognize that *Cornelius* would deem the particular actions at issue here to be unconstitutional.[23]

• In *Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985), the plaintiff was raped by an inmate, known to have a criminal and psychiatric history, who had been released from prison as part of a furlough.  *Id.* at 643.  The case only considers the "special relationship" doctrine, not the state-created danger doctrine, and, in any event, finds that the plaintiff fails to state a claim.  Similarly, the courts in *Carlson v. Conklin*, 813 F.2d 769 (6th Cir. 1987); *Estate of Gilmore v. Buckley*, 787 F.2d 714 (1st Cir. 1986); *Janan v. Trammell*, 785 F.2d 557 (6th Cir. 1986); *Schmidt v. HTG, Inc.*, 961 P.2d 677 (Kan. 1988); *Fox v. Curtis*, 712 F.2d 84 (4th Cir. 1983); *Wells v. Walker*, 852 F.2d 368 (8th Cir. 1988), each found that the plaintiffs there failed to state § 1983 claims.  Cases finding the asserted claim to be <u>insufficient</u> cannot somehow clearly establish that the conduct at issue here was unconstitutional.

• In *Greer v. Shoop*, 141 F.3d 824 (8th Cir. 1998), the plaintiff alleged that the defendant probation officers failed to warn her that her boyfriend, an inmate they had released on probation

---

[22] The *Petrone* decision is particularly parsimonious in describing the relevant facts, significantly diminishing any persuasive value it might have.

[23] Moreover, the Eleventh Circuit has recognized that the state-created danger analysis in *Cornelius* has "been supplanted" by subsequent Supreme Court precedent clarifying the boundaries of such claims.  *See White v. Lemacks*, 183 F.3d 1253, 1256-59 (11th Cir. 1999) ("To summarize, the 'special relationship' and 'special danger' doctrines applied in our decision in *Cornelius* are no longer good law, having been superseded by the standard employed by the Supreme Court in *Collins* [*v. City of Harker Heights*, 503 U.S. 115, 127 (1992)]").

to her custody, had contracted HIV. *Id.* at 826. The court assumed, without necessarily deciding, that the plaintiff had adequately pled a state-created danger claim. *Id.* at 828. However, it found that the defendants were entitled to qualified immunity, as the state-created danger doctrine was "an emerging rule of law in this circuit in 1991," and thus, was not clearly established at the time of the challenged conduct. *Id.* Arguably, a case that finds a set of facts to state a cognizable constitutional claim can "clearly establish" the unconstitutionality of the challenged conduct for future cases, even though the court also finds that the claim at issue was not clearly established earlier. However, *Greer* does not clearly establish the unconstitutionality of the conduct at issue here because, among other things, it assumed, without finding, the sufficiency of the claim being alleged, and because the facts at issue there do not involve facts that are similar to those here – *i.e.* an affirmative act of diminishing a court-supervised releasee's monitoring level despite his established probation violations.

• The remaining cases, *Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996); *Estate of Olivas v. City and County of Denver*, 929 F.Supp. 1329 (D. Colo. 1996); *Valenzuela v. Snider* 889 F.Supp. 1409 (D. Colo. 1995); *Poe v. Wyandotte*, 2000 WL 382038 (D. Kan. 2000) (unpublished); and *Jensen v. City of Oxnard*, 145 F.3d 1078 (9th Cir. 1998), are cited for the proposition that the court should not dismiss a claim on the grounds of qualified immunity "if it deprives a plaintiff of any opportunity to develop facts on which she might prevail on qualified immunity, particularly with respect to the 'reasonableness' inquiry." The Fredericks misread these cases. Whether particular conduct is "clearly established" as unconstitutional is a question of law, not fact. The Court has construed all of the Fredericks' allegations in the light most favorable to them, making further development of a factual record irrelevant.

In short, none of the cases cited by the Fredericks for the proposition that the unconstitutionality of Ms. Koehn and Mr. Riede's conduct was clearly established as of 2004 is sufficient to meet the Fredericks' burden. In addition to the cases cited by the Fredericks, the Court has conducted its own research, and has failed to locate any case that finds that a state actor's decision to reduce the effectiveness of supervision of an individual on court-supervised release, despite the individual's repeated violations of release conditions in the past, is unconstitutional under the substantive due process clause. The Court has taken particular note of cases such as *Bright*, *supra*; *Walters, supra*; and *Kennerly v. Montgomery County*, 257 F. Supp. 2d 1037 (S.D. Ohio 2003), yet finds that each of these cases misses one or more of the critical factual predicates necessary to deem them to clearly establish the unconstitutionality of the

22

conduct alleged here.[24]

Thus, although the Court finds today that the facts alleged by the Fredericks state a claim for a constitutional deprivation, the Court also finds that the Fredericks have failed to show that the determination that such conduct violates the constitution was clearly established at the time Ms. Koehn and Mr. Riede acted.  Accordingly, Ms. Koehn and Mr. Riede are entitled to qualified immunity on the Fredericks' § 1983 claims, and Claims 1-3 are dismissed.

The Court grants qualified immunity with some reluctance, however, as it is greatly troubled by the facts the Fredericks have alleged.  If those facts are true – indeed, even if they are mostly true – the Fredericks have exposed, at a minimum, a cascade of distressingly bad decisions on the part of the probation office.  The entire purpose of the court's directive that Mr. Wellington be monitored was to prevent him from posing a danger to the Fredericks, and yet the apathy and indifference of the probation office in carrying out its obligations here appears to have allowed Mr. Wellington to brazenly flaunt the conditions of his release.  Fortunately for the Fredericks – and, perhaps, for Ms. Koehn and Mr. Riede, as well – Mr. Wellington's conduct caused little harm other than post-hoc fear for what might have happened.  In any event, although they cannot recover monetarily from Ms. Koehn and Mr. Riede because of the principles of qualified immunity, the Fredericks can take some solace in the fact that this Court has found their

---

[24]As noted earlier, *Bright* presents a close factual similarity, but there was no constitutional violation because no affirmative act occurred.  Thus, it cannot clearly establish that the decision to downgrade Mr. Wellington's monitoring level was a constitutional violation.  *Kennerly* involves an inmate on house arrest who removed his monitoring device and escaped.  Among other things, like *Bright*, it found that the inmate's probation officer's failure to warn neighbors of the inmate's escape did not constitute an affirmative act.  *Walters*, although superficially involving a crime committed by a pretrial detainee while on court-supervised release, lacks the affirmative act of a change in monitoring level, or an individual with a history of violations of the terms of release.

allegations to state a claim for a constitutional deprivation, thus clearly establishing the unconstitutionality of such conduct for future cases.

### Willful and Wanton Conduct

In Claim 4, the Fredericks have pled a freestanding "willful and wanton conduct" claim, "actionable in tort" against Ms. Koehn and Mr. Riede. The cases cited by the Fredericks in support of this claim all involve claims in which a party was required to establish willful and wanton conduct so as to overcome the operation of the Colorado Governmental Immunity Act, C.R.S. § 24-10-110, 118(1).  *See e.g. Peterson v. Arapahoe County Sheriff*, 72 P.3d 440, 444 (Colo. App. 2003); *Davis v. Paolino*, 21 P.3d 870, 871, 873 (Colo. App. 2001) ("Defendants also argued that plaintiff's complaint failed to allege any facts that would demonstrate that Paolino's conduct was willful and wanton such that the CGIA would be inapplicable").

The Fredericks are correct that Colorado law requires them to affirmatively allege the facts supporting their assertion of willful and wanton conduct. C.R.S. § 24-10-110(5)(a), (b). However, such facts do not give rise to a freestanding claim in tort for "willful and wanton conduct" under Colorado law, and indeed, the Fredericks have pointed the Court to no authority that clearly recognizes such a claim.

To the extent the Fredericks assert "willful and wanton conduct" solely in an attempt to overcome the Colorado Governmental Immunity Act, that pleading may be appropriate, but is rendered moot by the Court's dismissal of the substantive claims against these Defendants on the grounds of qualified immunity. Because the Fredericks have not identified any other authority recognizing a standalone tort claim for willful and wanton conduct, Claim 4 is properly dismissed.

### C.  Motion for Judgment on the Pleadings[25]

RMOMS moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  A motion under this rule is subject to precisely the same standard as a motion under Rule 12(b)(6), as set forth *supra*.  *See Nelson v. State Farm Mut. Auto. Ins. Co.,* 419 F.3d 1117, 1119 (10th Cir. 2005).  As to the negligence claim, RMOMS contends that the Fredericks have not alleged facts which would establish that it owed the Fredericks a duty of care for purposes of Colorado tort law.  Rather, RMOMS asserts that the Fredericks only allege a contractual duty owed by RMOMS to the State of Colorado, which does not suffice for a negligence claim.  As to the § 1983 claim, RMOMS contends that the Fredericks have not alleged sufficient facts which would establish that RMOMS acted under color of state law, or that RMOMS deprived them of a right, privilege or immunity under federal law.

The Fredericks respond[26] that they have alleged sufficient facts to demonstrate that RMOMS owed them a duty of care independent of its contractual obligation to provide GPS monitoring.  They specifically contend that they and RMOMS had a special relationship which arose due to RMOMS' obligation to monitor Mr. Wellington and to report when he entered into a restricted Exclusion Zone.  They also contend that RMOMS was acting on behalf of a state agency in performing this function, and that RMOMS engaged in joint and concerted action which caused the substantive due process violation alleged in Claim 1, in specific, the state-created

---

[25] The Fredericks filed two motions (**#145, #153**) for an extension of time to respond to the motion for judgment on the pleadings, due to press of other business.  Ordinarily, the Court would deny such motions for lack of good cause.  However, because the motions are unopposed, and in light of the fact that the Fredericks filed their response to the motion, the Court grants both motions.

[26] With their response, the Fredericks have submitted several exhibits, which the Court does not consider pursuant to Rule 12(c).

danger claim.

**Negligence Claim**

The parties agree that to state a *prima facie* negligence claim under Colorado law, the Fredericks must allege facts which, if true, would demonstrate (1) that RMOMS owed them a duty of care, (2) that it breached that duty, and (3) that the breach caused the Fredericks to sustain damages. RMOMS only challenges the first element.

Whether a duty of care existed presents a question of law. *University of Denver v. Whitlock,* 744 P.2d 54, 57 (Colo. 1987). To determine whether a duty existed, the Court considers several different factors, including "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor." *Id.* (citation and quotation omitted). The Court may also consider other factors which become relevant in light of the facts of a particular case. *Id.* No single factor, alone, determines whether a duty exists. *Id.* Rather, whether a duty exists is essentially a question "of fairness under contemporary standards-whether reasonable persons would recognize a duty and agree that it exists." *Id.* (citation and quotation omitted).

In determining whether a duty exists, Colorado caselaw draws a distinction between misfeasance and nonfeasance. *Id.* at 57-58. With misfeasance, the defendant is alleged to have created some new risk of harm to a plaintiff, whereas with nonfeasance, the defendant has simply failed to act to prevent a harm. *Id.* at 58. When nonfeasance is alleged, courts generally impose no duty of care unless there was a special relationship between the plaintiff and the alleged tortfeasor-defendant which justifies imposition of a duty. *Id.* However, a duty of care may also

be imposed when a party commits himself by contract to perform a particular undertaking, and in doing so may assume a duty of reasonable care to protect a third person. *Id.* at 58 n.3; *see also Jefferson County School Dist. R-1 v. Justus,* 725 P.2d 767, 771 (Colo. 1986) (a duty to protect a third person may arise when a party undertakes to render a service which is reasonably calculated to prevent the type of harm which ultimately occurs to that third person).

The Court need not determine whether the Fredericks' allegations, if true, would demonstrate the existence of a special relationship.[27]  Rather, the Court concludes that their allegations, if true, would establish that RMOMS undertook an obligation to monitor Mr. Wellington's whereabouts and to make a report to his probation officer whenever he entered into an area which he was forbidden to enter, due to the threat he presented to the Fredericks.  The allegations, if true, also would establish that RMOMS undertook this obligation with the full knowledge that the service it was providing was intended to ensure the safety of the Fredericks. Finally, the allegations, if true, would show that RMOMS failed to report more than 100 violations by Mr. Wellington to his probation officer over a 4-month period, despite its affirmative obligation to report such violations, and thus arguably engaged in misfeasance.  The nature of RMOMS' monitoring obligation, coupled with the frequent alleged violations by Mr. Wellington, would have made an injury to the Fredericks foreseeably likely.  Based upon these allegations, the Court concludes that the Fredericks have alleged sufficient facts to support imposition of a duty of care on RMOMS.

---

[27] The Court notes that a "special relationship" for purposes of tort liability is entirely distinct from the "special relationship doctrine" for purposes of a substantive due process claim.  *See DeShaney*, 489 U.S. at 201-02.  The Fredericks have made no factual allegations which would support the application of the "special relationship doctrine" to RMOMS, because they have not alleged that the Fredericks were under RMOMS' custody or control.  *See Armijo*, 159 F.3d at 1261.

RMOMS has argued that under *Davenport v. Community Corrections of the Pikes Peak Region, Inc.,* 942 P.2d 1301 (Colo. App. 1997), imposition of a duty of care is not warranted. However, *Davenport* is factually distinguishable.  The issue presented was whether a private community corrections corporation could be liable for the intoxicated driving of a halfway house resident, who was under supervision following his conviction for burglary.  The court declined to impose a duty of care on the corporation to the general public for the actions of its residents, and concluded that the resident's conduct was not foreseeable due to the nature of his conviction.  By contrast, the case at bar involves a specific undertaking by RMOMS to monitor a single individual who was restricted from entering specific areas where the Fredericks were located.  At the pleading stage, these allegations are sufficient to support a duty of care.

### Concerted Action Claim

RMOMS contends that the Fredericks have failed to state a claim against it pursuant to 42 U.S.C. § 1983 because they have not alleged that RMOMS is a state actor, or that RMOMS deprived the Fredericks of a federal right.

The Court finds that the Fredericks have alleged sufficient facts to establish that RMOMS is a state actor.  However, they have not alleged sufficient facts to establish that RMOMS violated their constitutional rights.  According to the Fredericks' response, their constitutional claim against RMOMS is the same state-created danger claim that they asserted against Ms. Koehn and Mr. Riede in Claim 1.  However, the Fredericks' state-created danger claim against RMOMS suffers from several missing elements.  Assuming the allegations are sufficient to support the first 4 elements of state-created danger claim – that is, that RMOMS took affirmative acts that had the effect of increasing the risk of harm to an identifiable victim – the Fredericks fail to adequately

allege elements 5 or 6, namely, RMOMS' reckless disregard of the risks posed by its conduct and conscience-shocking circumstances.  There are no allegations that RMOMS was consciously aware that its actions would expose the Fredericks to an unreasonable risk of harm, because there is no assertion that RMOMS was aware of the particular risk that Mr. Wellington posed.  All RMOMS knew of Mr. Wellington was that he was restricted by the terms of his probation from entering certain areas.  The Fredericks have not alleged that RMOMS knew of Mr. Wellington's history of stalking the Fredericks, nor that he had continued to harbor violent feelings towards them.  Although one could argue that RMOMS might reasonably have inferred that the Exclusion Zones were designed to protect certain persons therein from Mr. Wellington, such an inference does not arise to the level of scienter necessary to show knowledge or conscious disregard of the risks that Mr. Wellington posed to the Fredericks.  Moreover, the Fredericks have not pled facts showing that RMOMS' participation in a switch to passive monitoring of Mr. Wellington occurred in circumstances that could be considered conscience-shocking.  RMOMS' involvement with that process appears to be simply a matter of adjusting the services it provides in response to a request by its customers – Ms. Koehn and Mr. Riede – for a lower-cost product.

The Fredericks ask that if the Court deems their allegations to be insufficient, they be permitted to file a Third Amended Complaint.  In specific, they would seek to add factual allegations derived from the exhibits submitted with their response.  However, allegations premised upon these exhibits would either show that RMOMS was performing a State function (which this Court has already assumed it was), that RMOMS failed to perform its duty (performance is not at issue), and that RMOMS participated in the decision to switch Mr. Wellington from active to passive GPS monitoring (which is already evident from the allegations

in the Second Amended Complaint).  Thus, these allegations would not save the Second

Amended Complaint from its pleading deficiencies.

**IT IS THEREFORE ORDERED**:

(1)     The motion to dismiss **(#34)** the claims in the original complaint is **DENIED**, as

moot.

(2)     The motion to dismiss **(#77)** filed by Ms. Koehn and Mr. Riede is **GRANTED**.

Claims 1 through 3 are **DISMISSED** on the grounds of qualified immunity, and

Claim 4 is **DISMISSED** as moot.  There being no remaining claims asserted

against these Defendants, the caption of the case shall be **AMENDED** to omit any

reference to Ms. Koehn and Mr. Riede.

(3)     The motions **(#145, #153)** for an extension of time to respond to the motion for

judgment on the pleadings are **GRANTED**.

(4)     The motion for judgment on the pleadings **(#128)** is **GRANTED** in part and

**DENIED** in part.  Claim 6, asserting a violation of § 1983 against RMOMS, is

**DISMISSED**, leaving only Claim 5, sounding in negligence, for further

adjudication.

Dated this 28th day of September, 2007

BY THE COURT:

_____

Marcia S. Krieger
United States District Judge

30