IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-00957-MSK-KLM

JAMES FREDERICKS,
BROOKE FREDERICKS,
ELISABETH FREDERICKS, and
SARAH FREDERICKS,

        Plaintiffs,

v.

TRINA KOEHN,
MICHAEL RIEDE, and
MARY MARGARET JONSSON, Ph.D.,

        Defendant.

_____

**OPINION AND ORDER GRANTING DEFENDANT JONSSON'S MOTION
FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to Defendant Jonsson's Motion for

Summary Judgment **(# 295)**, the Plaintiffs' response **(# 369)**, and Dr. Johnsson's reply **(# 382)**.[1]

---

[1] The Plaintiffs moved for an extension of time **(# 309)** to October 7, 2008 to file a response to Ms. Jonsson's motion. Dr. Jonsson opposed **(# 310)** the request as being unnecessary, but did not articulate any particular prejudice that would flow from granting it. Although the motion remained pending, October 7, 2008 passed without any filing by the Plaintiffs. On October 21, 2008, the Plaintiffs again moved for an extension of time **(# 360)** to October 28, 2008 to file their summary judgment response. Dr. Jonsson once again opposed the motion **(# 365)**. The Plaintiffs filed their summary judgment response on October 28, 2008. By a text docket entry on October 31, 2008, the Court granted **(# 374)** the Plaintiffs' second request for an extension of time. In doing so, the Court set a deadline of October 28, 2008 for the filing of the Plaintiffs' response, thus rendering the original Motion for Extension of Time to October 7, 2008 moot. Similarly, because the Court granted an extension of time making the Plaintiffs' response timely, Dr. Jonsson's Motion to Grant Her Motion for Summary Judgment [as unopposed] **(# 335)** is denied as moot.

1

**FACTS**

For purposes of the limited issue presented in this motion, only a highly summarized recitation of the background facts is necessary. In 2000, Troy Wellington, a one-time neighbor of the Plaintiffs, began stalking Plaintiffs Elisabeth and Sarah Fredericks, then teenagers. The Fredericks secured a restraining order against Mr. Wellington and moved to a new location, but neither action was sufficient to deter Mr. Wellington. In 2003, Mr. Wellington was arrested and pled guilty to felony stalking. He was sentenced to a term of probation, including mental health counseling. The probation department retained the services of Dr. Jonsson to conduct a psychological evaluation of Mr. Wellington in order to assist in setting the terms of his probation. On May 12, 2004, he had a single meeting with Dr. Jonsson. (The contents of this meeting are discussed in more detail herein.) Following this meeting, Dr. Jonsson did not advise the probation officers supervising Mr. Wellington of any particular concerns. On May 25, 2004, Mr. Wellington attempted to break into the Fredericks' home, but was apprehended by police. He was charged with various felonies and sentenced to a lengthy prison term.

As relevant herein, the Plaintiffs assert a single claim for negligence against Dr. Jonsson, alleging that Dr. Jonsson failed to warn them or Mr. Wellington's probation officers of the threat

---

The Plaintiffs subsequently moved to "supplement" **(# 405)** their summary judgment response, pointing the Court to a 2006 case from Utah and citing the Court to certain deposition testimony that was taken on October 29, 2008, the day after the Plaintiffs filed their summary judgment response. The Court denies the Plaintiffs' motion as to their citation and argument concerning the Utah case, as that case was available at the time the Plaintiffs filed their response and thus, is not a proper subject for supplementation. *Compare* Fed. R. Civ. P. 15(d) ("supplemental" pleading is one that "set[s] out any transaction, occurrence, or event that happened <u>after the date of the pleading to be supplemented</u>") (emphasis added). The Court grants the motion with regard to the submission of the October 29, 2008 deposition testimony, but finds that such testimony does not alter the analysis herein.

to the Plaintiffs posed by Mr. Wellington. *Docket #* 391, ¶ 194-212.

Dr. Jonsson moves for summary judgment **(# 295)** arguing: (i) pursuant to C.R.S. § 13-21-117, a mental health professional can be held liable for the actions of a patient only if the mental health had knowledge of a serious threat made by the patient against a specific person and failed to adequately warn both law enforcement officials and the potential victim; and (ii) that the Plaintiffs cannot show that Mr. Wellington made any specific threats in the single meeting he had with Dr. Jonsson.

## **ANALYSIS**

### A. **Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B. Applicability of C.R.S. § 13-21-117**

C.R.S. § 13-21-117 provides that:

> A . . . mental health professional . . . shall not be liable for damages in any civil action for failure to warn or protect any person against a mental health patient's violent behavior, and any such person shall not be held civilly liable for failure to predict such violent behavior, except where the patient has communicated to the mental health care provider a serious threat of imminent physical violence against a specific person or persons. When there is a duty to warn and protect under the circumstances specified above, the duty shall be discharged by the mental health care provider making reasonable and timely efforts to notify any person or persons specifically threatened, as well as notifying an appropriate law enforcement agency or by taking other appropriate action including, but not limited to, hospitalizing the patient.

This statute codifies the common law duty that mental health providers owe to third parties who may be injured by the violent acts of the patient. *Sheron v. Lutheran Medical Center*, 18 P.3d 796, 800 (Colo. App. 2000). It defines the scope of the duty that must be breached before liability will arise, and sets out the elements of the claim that the Plaintiffs must prove to establish their claim against Dr. Jonsson.[2] According to the statute, the Plaintiffs must

---

[2] In this regard, the Court rejects the Plaintiffs' implicit argument that the statute constitutes an affirmative defense on which Dr. Jonsson bears the burden of proof. Although the

4

show that: (i) Mr. Wellington "communicated . . . a serious threat of imminent physical violence against a specific person or persons" to Dr. Jonsson; and (ii) that Dr. Jonsson failed to "make responsible and timely efforts to notify" both the target(s) of the threat and the appropriate law enforcement agency.

The Plaintiffs argue that the statute applies only to limit the liability of a mental health provider when a "patient" – not an individual receiving other forms of professional services from the mental health provider – engages in violence towards a third party.³ Mr. Wellington, the Plaintiffs argue, was not Dr. Jonsson's "patient," but rather, an individual referred to her by the probation department to "diagnose [for] mental dysfunction" and "to make correctional treatment recommendations." This, the Plaintiffs argue – without any supporting legal citation – rendered Mr. Wellington something other than Dr. Jonsson's "patient."

The Colorado legislature did not attempt to define "patient" in the context of C.R.S. § 13-21-117, nor did the legislature include that term in the defnitional section of C.R.S. § 12-43-201, which relates to the regulation of mental health providers. When the legislature fails to define a statutory term, the Court will assume that the legislature intended that term to bear its ordinary,

---

Colorado courts have sometimes referred to the statute as setting forth an "immunity" enjoyed by a mental health provider, *see McCarty v. Kaiser-Hill Co.*, 15 P.3d 1122, 1125 (Colo. App. 2000), this Court finds *Sheron*'s observation that the statute "describes the duty to protect third persons" to be a more accurate allocation of the burden of proving the statute's terms. If, as the Plaintiffs suggest, the statute is an affirmative defense upon which Dr. Jonsson bears the burden of proof, they have failed to identify the elements of their direct claim or to cite the source of those elements.

³The Plaintiffs do not cite caselaw for the proposition that mental health providers owe some particular alternative duty to third parties to protect them from acts of violence committed by non-patients. In light of the statement in *Sheron* that C.R.S. § 13-21-117 "codif[ies] the common law duty [owed by] mental health care providers to third parties," the Court has grave doubts that any alternative duty exists beyond that articulated in the statute.

5

everyday meaning. *Board of County Commissioners v. Exxonmobil Oil Corp.*, 192 P.3d 582, 586 (Colo. App. 2008). The Oxford English Dictionary, 2d Ed., defines "patient" in this context as "a person receiving or (in later use) registered to receive medical treatment." Merriam-Webster's Collegiate Dictionary, 10th Ed., defines "patient" in this context as "an individual awaiting or under medical care and treatment," or "the recipient of any of various personal services." Both definitions invoke the notion of "treatment." The Oxford English Dictionary defines that term in this context as being a "medical . . . application or service," and Merriam-Webster's dictionary defines the term "treatment" to mean "the techniques or actions customarily applied in a specified situation." Thus, in common usage, a "patient" is a person who is awaiting or receiving services or actions of a medical nature. The Plaintiffs do not argue that diagnostic services or the preparation of a treatment plan are not services that are medical in nature, nor that they are not the typical services that a psychologist would perform in assessing an individual's mental health. Thus, the Court finds that Mr. Wellington was a "patient" of Dr. Jonsson.

Any confusion on this point is adequately dispelled by *Slack v. Farmer's Ins. Exchange*, 5 P.3d 280 (Colo. 2000). In that case, the plaintiff was injured in an auto accident and required by her insurance company to submit to an independent medical exam ("IME"), conducted by a doctor not of her choosing. She was subjected to an assault and mistreatment by the doctor conducting the IME, and later sued her insurance company. The insurance company sought to apportion some of the liability to the doctor himself. The plaintiff resisted the insurance company's designation of the doctor as a possible non-party at fault, arguing that "an IME [doctor] owes no duty to a patient who has been referred by an insurance company" and that *Id.*

"an IME [doctor] does not owe a duty of care to the examinee to diagnose the examinee's condition correctly because no physician-patient relationship arises from the examination." 5 P.3d at 283. The Colorado Supreme Court rejected this argument, explaining that "the independent medical examination itself may be said to create a relationship between the parties and impose upon the physician a duty to exercise a level of care that is consistent with his professional training and expertise," and that "an IME [doctor] remains liable for any injury he negligently or intentionally inflicts on a patient during an examination, but does not owe the examinee a duty to diagnose correctly his or her condition." *Id.*

*Slack* makes clear that, notwithstanding the involuntary nature of the relationship, the physician conducting an IME owes all of the same legal duties (other than the duty to diagnose) to the IME "patient"[4] that it would owe to a patient voluntarily seeking treatment. There is no reason why that same logic would apply with equal force to the situation presented here – that is, that Dr. Jonsson would owe all of the same duties arising out of her examination of Mr. Wellington that she would owe with regard to any patient voluntarily seeking treatment from her. Dr. Jonsson's examination of Mr. Wellington for purposes of developing a mental health treatment plan for him is conceptually similar to an IME examination – *i.e.* it is involuntary on the examinee's part, and the doctor conducting the examination is not intending to provide continuing treatment. Despite these considerations, *Slack* indicates that Colorado continues to impose the same sorts of duties on the medical providers conducting such examinations that would otherwise apply at law, suggesting that Dr. Jonsson's duties with regard to her examination of Mr. Wellington gave rise to the same physician-patient relationship as that

---

[4]This Court notes that in the quoted text, *Slack* uses the term "patient" synonymously with "examinee."

7

contemplated by C.R.S. § 13-21-117. Accordingly, the Court finds that the duty imposed by that statute is the only duty that Dr. Jonsson owed to the Plaintiffs.

**C. Communication of a serious threat**

For liability to arise under C.R.S. § 13-21-117, the Plaintiffs must show that Mr. Wellington "communicated to [Dr. Jonsson] a serious threat of imminent physical violence against a specific person."

Dr. Jonsson has come forward with evidence that, in her single meeting with Mr. Wellington, Mr. Wellington did not make any actual threat that he would engage in imminent physical violence against any of the Plaintiffs. In her own deposition, Dr. Jonsson testified that Mr. Wellington disclosed that although he continued to harbor "fantasies" about hurting Elisabeth and Sarah Fredericks, including "homicidal thoughts," he "never indicated that he had planned to harm the girls or that he intended to harm the girls." Dr. Jonsson explained that "He did not tell me of a . . . specific plan to ever approach them and do this . . . He told me that he did have fantasies in general about these things. He told me that he never had a plan, that he never had an intent." Dr. Jonsson has also supplied Mr. Wellington's deposition, in which he explained that "I told her that [harming the girls] had crossed my mind [but that] I never told her that I was planning on doing that." When asked if he told Dr. Jonsson that "sometime in the future, [he] wanted to go and harm the girls in the Fredericks family or their parents . .. did you ever say that to [Dr. Jonsson]," Mr. Wellington stated "I don't believe so."[5]

---

[5]Similarly, Mr. Wellington was asked whether, when he appeared at Dr. Jonsson's office for the interview, he had "any plan in your head that you were going to go and imminently harm" the Plaintiffs, and he denied having such plan. He explained that the decision to go to the Plaintiffs house on May 25, 2004 was not formed until the evening of those events. Finally, Mr. Wellington acknowledged that it was true that he "never expressed to [Dr. Jonsson] any intent or plan to go and hurt any one of the Fredericks family after he left the session with her on May 12,

8

In response, the Plaintiffs do not point to any particular language in either Dr. Jonsson's or Mr. Wellington's deposition testimony that they contend was an outright threat. Instead, they rely on precisely the same language discussed above – Mr. Wellington's admission to harboring "thoughts" and "fantasies." However, without a corresponding statement of intention to act, "thoughts" and "fantasies" alone do not constitute "threats." *See generally* Black's Law Dictionary, 7th Ed. at 1489 (defining "threat" as "a communicated <u>intent</u> to inflict harm . . ."); Merriam-Webster's Collegiate Dictionary, 10th Ed. at 1224 (defining "threat" as "<u>an expression of intention</u> to inflict evil, injury, or damage").

The parties' dispute on this point grows from their differing definitions of the statutory phrase "the patient has communicated . . . a serious threat." The Plaintiffs interpret this language to require a mental health provider to comprehensively assess both the background and history of the patient, as well as present statements made by the patient, to determine whether the patient poses a generalized threat of harm to a particular person, and to issue a warning if so. The Defendants interpret the statute more narrowly, understanding it to require notification only where the patient has affirmatively stated his or her own subjective intent to engage in a future act of violence. Although the parties extensively argue the facts that underlie their respective interpretations of the statutory language, the Court finds that the issue presented is one of pure statutory interpretation, allowing resolution of this issue as largely one of law.

The Court rejects the Plaintiffs' argument – that a "patient has communicated . . . a threat" merely by virtue of his or her past conduct, without ever expressing a subjective intent to act in the future – as inconsistent with the language chosen by the legislature. A construction

---

2004."

9

using the phrase "patient has communicated . . . a threat" to identify an <u>inference</u> that a health care provider has drawn from the patient's past behavior would be extremely unusual and stilted. More commonly, we would either modify the subject to specify the actual thing that was doing the communicating – *e.g.* "that patient's <u>behavior</u>/<u>demeanor</u>/<u>history</u> has communicated a threat" – or else instead of the active verb "commuinicated," we would use a verb that more accurately indicates that the message is being inferred by an observer, rather than purposefully conveyed by the actor – *e.g.* "the patient <u>poses</u>/<u>represents</u> a threat."

Notably, the only case interpreting the "communicated a threat" language of C.R.S. § 13-21-117 involves an express threat conveyed directly by the patient's own words. In *McCarty v. Kaiser-Hill Co.*, 15 P.3d 1122, 1125 (Colo. App. 2000), the court determined that, as a matter of law, a "serious threat" had been shown by a patient's 1:30 a.m. telephone call to his psychologist, describing "negative feelings about his supervisors and express[ing] concern that he might not be able to control his anger," indicating that he was "feeling sort of homicidal," and stating that the supervisors "don't deserve to die [but] do deserve to have their ass kicked." Consistent with the dictionary definitions of "threat" as entailing some indication of future intent, the patient's statements in *McCarty* are phrased in the present ("deserve to have their ass kicked") and future ("might not be able to control his anger") tenses, demonstrative of an intent to take some future action. By contrast, the Court is aware of – and the Plaintiffs cite – no cases for the proposition that the "threat" that is "communicated" is an generalized inference that a patient's past behavior suggests that the patient poses a continuing risk to a third party.

Other considerations bolster the Court's conclusion that the "threat" mentioned in C.R.S. § 13-21-117 is a patients expression of present intent to act, not a generalized assessment of the

possibility that the patient <u>might</u> act.  C.R.S. § 13-21-117 expressly states that a provider "shall not be held civilly liable for a failure to predict such violent behavior," unless the patient "has communicated a threat."  It would be curious indeed for the legislature to suggest that liability for "failure to predict" violent behavior would be limited, only to then create a broad obligation of a provider to attempt to make just such a prediction based on inferences drawn from the patient's case history.  The "failure to predict" language in the statute harmonizes much better with a construction of "communicated a threat" that requires a provider to act only when a patient expresses an intention to commit a violent act; in such circumstances, little "prediction" is required.  This is consistent with findings that the purpose of C.R.S. § 13-21-117 was to codify a narrow scope of the mental health provider's duty to warn – *i.e.* that the duty arose only where the patient made "specific threats to specific victims."  *See Brady v. Hopper*, 570 F.Supp. 1333, 1339 (D. Colo. 1983); *Halverson v. Pikes Peak Family Counseling and Mental Health Ctr., Inc.,* 795 P.2d 1352, 1355 (Criswell, J., concurring) (C.R.S. § 13-21-117 was passed in order to codify rules adopted in *Brady* and similar cases).  Adopting the Plaintiffs' construction of the statute to create liability whenever a provider failed to warn third parties of the generalized possibility that a patient might act violently would expand, not constrain, a provider's duty.  Many mental health patients will have a history of behaviors that could be construed to pose a risk of physical violence threat to specific persons – family members, ex-relations, neighbors, etc.  A broad construction of the statute would require a provider to extensively contact potential victims and law enforcement personnel based on the patient's history, even if the patient's current mental health condition did not raise a concern about future violence.

Perhaps most importantly, the Plaintiffs' construction of the statute would yield bizzare

11

results in this case. The Plaintiffs suggest that because Mr. Wellington's history revealed a high likelihood that he would continue to engage in violent behavior, Dr. Jonsson was under an obligation to warn the Fredericks and the probation office, even though Mr. Wellington had not expressed any subjective intention to engage in future violence. But a warning that Mr. Wellington posed a generalized harm of future violence would have served no purpose; both the Fredericks and the probation office were well award of Mr. Wellington's past stalking activities, and an unspecific warning that Mr. Wellington had dangerous propensities would not have provided any more meaningful information. By contrast, a rule that required Dr. Jonsson to warn if, and only if, Mr. Wellington expressed a subjective intention to engage in particular acts of violence in the future would allow parties to take specific precautions to prevent the particular act of violence threatened. In such circumstances, a warning <u>would</u> provide parties with information of which they might not otherwise be aware. The Court is obligated to construe a statute in a way that renders a sensible result. *New Stanley Assocs. v. Town of Estes Park*, 200 P.3d 1118, 1121 (Colo. App. 2008). Only Dr. Jonsson's interpretation of the statute in this context yields a sensible result.

Accordingly, the Court finds that the "patient has communicated . . . a threat" language in C.R.S. § 13-21-117 requires a mental health provider to warn others when a patient has affirmatively expressed a subjective intention to engage in a violent act in the future. Because it is undisputed that Mr. Wellington expressed no subjective intention to act during his meeting with Dr. Jonsson, she is entitled to summary judgment on the claim against her.

**CONCLUSION**

For the foregoing reasons, Defendant Jonsson's Motion for Summary Judgment **(# 295)**, is **GRANTED**, and judgment shall enter in favor of Dr. Jonsson and against the Plaintiffs at the conclusion of proceedings in this case. The Plaintiffs' Motion for Extension of Time **(# 309)** to file a summary judgment response is **GRANTED**. Dr. Jonsson's Motion to Grant Her Motion for Summary Judgment [as unopposed] **(# 335)** is **DENIED AS MOOT**. The Plaintiffs' Motion to Supplement **(# 405)** their summary judgment response is **GRANTED IN PART**, insofar as the Court has considered the tendered deposition testimony, and **DENIED IN PART**, insofar as the caselaw and supporting arguments proffered by the Plaintiffs are not the proper subjects for supplementation. Because the claims against Dr. Jonsson turn on factual and legal issues independent from those of the remaining parties in this action, the Court finds that there is no just reason to delay entry of judgment in Dr. Jonsson's favor, and judgment shall enter pursuant to Fed. R. Civ. P. 54(b) simultaneously with this Order.

Dated this 20th day of March, 2009

        **BY THE COURT:**

        */s/ Marcia S. Krieger*

        Marcia S. Krieger
        United States District Judge